[No. 16154. Department One. April 8, 1921.]

KELLEY-CLARKE COMPANY, *Respondent*, v.
NORTHWESTERN FISHERIES COMPANY,
*Appellant*.[1]

APPEAL (418)—REVIEW—FINDINGS. While the findings of a trial court have no binding force on appeal, they will always be given great weight because of the fact that the lower court has a distinct advantage over the appellate court in determining the truth because of having the witnesses before it.

PRINCIPAL AND AGENT (25)—COMPENSATION—DURATION. Where an agent, employed at an agreed price for a certain time, continues to discharge the same duties after the expiration of the term, without any new agreement but with the knowledge of the principal, the legal presumption is that he continues at the original rate of compensation.

Appeal from a judgment of the superior court for King county, Frater, J., entered May 11, 1920, upon

[1] Reported in 197 Pac. 32.

findings in favor of the plaintiff, in an action on contract, tried to the court. Affirmed.

Bogle, Merritt & Bogle and Kerr & McCord, for appellant.

Walter S. Fulton and Donworth, Todd & Higgins, for respondent.

BRIDGES, J.—By this action the plaintiff sought recovery of certain commissions alleged to be due from the defendant, growing out of the sale and handling of certain canned salmon during the year 1917. The case was tried by the court without a jury, and resulted in a judgment for the plaintiff in the sum of $24,690.08, together with certain interest on such sum. From this judgment, the defendant has appealed.

Appellant is an extensive packer of salmon, and has its principal place of business in Chicago, with an important branch or organization at Seattle, in this state. The Booth Fisheries Company, which plays an important part in this case, is the owner of all of the capital stock of the appellant, and has numerous branch houses throughout the United States, in the jobbing business. The respondent is a Washington corporation, and is one of the largest brokers of its kind in the United States. The canning of salmon on this coast commences during the latter part of August or the first of September of each year.

On the 2d day of November, 1912, a written contract was entered into between the appellant and respondent, whereby the latter was made the exclusive selling agent for all of the salmon pack of the appellant during the years 1913, 1914 and 1915. For these services, the respondent was to receive a five per cent commission on the sale value of all such pack, but the appellant reserved the right to fix prices at which the salmon

might be sold. During the life of this contract, three important modifications were made as follows: (1) the appellant purchased the packing plant of Gorham & Company, and, by the terms of the purchase, that company reserved forty thousand cases out of each year's pack, and, at the request of appellant, the respondent released such forty thousand cases from the written contract, and was to receive no compensation on account thereof. These Gorham reservations are in no way involved in this controversy and will not be again mentioned. (2) The respondent also released from the contract a reasonable amount of salmon each year to go to the branch houses of the Booth Fisheries Company. It was apparently contemplated that such reasonable amount would be from three thousand to seven thousand cases per annum, and, as a matter of fact, the number of cases taken by the Booth Fisheries Company branch houses during the years 1914, 1915, and 1916 ran from seven thousand eight hundred and forty-five cases in 1914, to three thousand nine hundred and sixteen in 1916. If more than such contemplated number of cases should be taken by the Booth branch houses, then the respondent was entitled to two per cent commission on such excess; (3) the appellant itself, during the life of the written contract, entered into an agreement with Armour & Company, of Chicago, whereby the latter purchased one hundred and forty thousand cases each year out of the appellant's total pack, and it was agreed that the respondent was to receive a two per cent commission thereon instead of five per cent, as stated in the written contract.

While the respondent was to have nothing to do with the sale of any salmon so released, it was, by the agreement, to look after the actual shipping and billing of the same. These various releases were for the most part made by oral agreement. Throughout the

trial and argument, the Armour & Company and Booth branch house salmon have been spoken of as reservations and we will so speak of them. The original written contract, subject to the modifications mentioned, became the contract under which the parties operated during the year 1916. There is no controversy or apparent misunderstanding as to what the contract for the year 1916 and prior years was, and there is not involved in this case anything during those years. The controversy here is as to what was the 1917 contract.

It seems to be conceded that it was agreed that for all of the 1917 pack, except the Armour and Booth branch house reservations, the respondent was to be paid, and has been paid, the five per cent commission provided for in the original written contract, and the controversy here is as to whether the 1916 contract was continued to cover 1917.

The respondent contends that the 1917 agreement entitled it to two per cent commission on all salmon shipped to the Booth branch houses in excess of a reasonable amount, and such reasonable amount was to be determined by the number of cases taken by those houses during the previous years, and it was to be paid two per cent commission on the one hundred and forty thousand cases shipped to Armour & Company, and that it was to look after the shipping and billing of those salmon. On the contrary, the appellant contends that the 1917 agreement was that it reserved the right to look after the shipping and billing of all fish going to Armour & Company and to the Booth branch houses, and that it reserved the right to give to the Booth branch houses as much of its pack as it saw fit, and that, if it did take care of the shipment and billing of such reservations, the respondent was to receive no

compensation, otherwise it was to receive two per cent compensation only on the one hundred and forty thousand cases sold to Armour & Company, and that it exercised its reserved rights and itself looked after the shipping and billing of all such salmon, and that respondent had nothing to do with these reservations. The trial court found the agreement to have been made in accordance with the respondent's contention, and fixed the contemplated amount of fish to be taken by the Booth branch houses at seven thousand five hundred cases, and allowed respondent two per cent on the difference between the seven thousand five hundred cases and the thirty eight thousand six hundred and eighty cases actually taken by the Booth branch houses during that year, and also allowed it to recover two per cent commission on the one hundred and forty thousand cases shipped to Armour & Company.

We have often held that a case tried by the lower court, without a jury, will be heard by us *de novo,* and that the findings of that court have no binding force upon us, and that we will go into the record for the purpose of determining whether the findings are sustained by a preponderance of the evidence, and that because that court, having the witnesses before it, has a distinct advantage over us in determining the truth, its findings will always be given great weight, and that we will not disturb them unless it is made to clearly appear that the evidence preponderates against them.

In this spirit we have very carefully considered the testimony, and we are unable therefrom to conclude that the findings of the trial court are against the preponderance or weight of the evidence. The negotiations concerning the 1917 contract were in part oral and in part by written correspondence. Whatever oral

contract there was, was made, for the most part, in the appellant's office in Chicago, during November and December of 1916. At these conferences Mr. Clarke represented the respondent and Mr. Ames and Mr. Smithers represented the appellant. According to a previous understanding between the parties, or some of them, Mr. Clarke had written out and taken with him to Chicago a proposed written contract covering the year 1917. This proposed contract was very nearly in the words of the original 1912 contract, except it provided for the Gorham & Company reservations, and provided for its continuance till terminated by a twelve month's notice given by the one party to the other. It was Mr. Clarke's idea that the reservations for Armour & Company and the Booth branch houses were to. be oral exceptions to the contract, just as they had been oral exceptions thereto in previous years. This proposed contract was not acceptable to Mr. Ames or to Mr. Smithers, and it was apparently agreed that certain modifications of it should be made by Mr. Smithers. Mr. Clarke testified that such modifications were to be in accordance with what he now contends was the 1917 contract, but Mr. Smithers and Mr. Ames contend that the changes to be made in the proposed contract were to be those which they now contend was the verbal 1917 contract. In any event, this proposed contract is not of much importance because, for one reason or another, Mr. Smithers never rewrote it.

If it could be held that the preponderance of the oral testimony was with the appellant because there were two witnesses for it against one for the respondent, yet we must take into consideration the written correspondence, the conduct of the parties, and the surrounding circumstances, all of which, we think, strongly. support the contract as contended for by the re-

spondent.  In considering this correspondence and the surrounding circumstances, we must keep in mind the appellant's version of the oral agreement to the effect that the 1916 contract was to be modified so as to reserve to it the right to do all of the handling of the Armour & Company salmon, as well as that for the Booth branch houses, and that if it elected to handle these reservations itself, that is, look after the shipping, billing, etc., the respondent was not to receive any compensation on account thereof.  The correspondence shows quite conclusively that, up to about September 1, 1917, being about the time the pack for that year commenced, the appellant not only had made no arrangements to handle these reservations itself, but acted on the idea and assumption that they would be handled by the respondent in identically the same way they were handled during the year 1916.  In March of 1917, the appellant wrote respondent mentioning that it had not had time to redraft the proposed new contract, and said:

"In the meantime you need have no uneasiness, but go ahead and make your arrangements to market the Northwestern Fisheries and Fraser River Cannery packs, protecting our branch house requirements (that is the Booth requirements) and Armour & Company's orders."

As late as August, 1917, Mr. Whitelaw, vice president of the appellant and in charge of its affairs in Seattle, wrote respondent:

"With reference to billing Northwestern Fisheries Co. salmon to Armour & Company: On taking this matter up with Mr. Smithers, he advises that this billing is to be handled in the same manner as was the case last year. Will you please be governed accordingly."

In the early part of September, 1917, Armour & Company wrote respondent, saying:

"We are advised by the local office of Booth Fisheries Company (it being the same thing as the Northwestern Fisheries Company) that you will arrange to have stencilled on each case of salmon which we purchase through you the initials 'K-C' in a diamond." ('K-C' meaning Kelley-Clarke.)

At the same time appellant notified its various packing houses to stencil all cases going to Armour & Company with the mark "K-C." In July, 1917, the respondent wrote to the appellant's Seattle office concerning the agreement the parties had entered into with reference to the Booth branch house and Armour & Company reservations. In that letter it was stated that no brokerage was to be paid, "on salmon supplied the Booth branches provided no unusual amount is required," and further states that the number of cases which the parties all had in mind was three thousand for that year. The letter further says that:

"When in Chicago I agreed with Mr. Smithers as to the rate of brokerage on the business with Armour & Company."

This letter was never answered nor was the contract as therein stated ever expressly denied until the commencement of this suit. On about the first of September, 1917, the appellant made public its opening quotations at a price somewhat higher than rival packing companies. The respondent at once contended that such act on the part of the appellant was unfair and in violation of the understanding between them. Out of this controversy, there at once grew a strained and unfriendly relationship between the contracting parties. It was not until a few days after this unfortunate controversy arose, and about September 8 (being at about the commencement of the packing season), that appellant notified respondent that it would itself

ship and bill all of the Armour & Company and Booth branch house reservations. The respondent thereafter had very little to do with these reservations. While it cannot be said that the correspondence and the circumstances, to which we have called attention, expressly prove respondent's version of the contract, yet they point the way we should go. We have not overlooked certain parts of the correspondence and actions of the parties which appellant insists point the other direction, but we do not think more can be said of these than that they are not entirely inconsistent with appellant's theory.

But appellant contends that we should construe this controversy in accordance with the usual custom of business men, and that it would be unreasonable to suppose that it made a contract with the respondent to pay something like $25,000 for no services except merely looking after the shipping, loading and billing of these reservations, a service which, as the appellant's testimony tends to show, could be performed by a $100 a month man, working three or four months. But it must be remembered that for the year 1916, the appellant did agree to pay, and actually paid, the respondent this two per cent for the identical services which it now contends were so insignificant. It is fair to presume that appellant considered it was then receiving adequate return for this payment. It should be kept in mind that the respondent actually sold and handled the greater portion of appellant's 1917 pack, and the latter might well have agreed to this two per cent on the reservations in order to obtain respondent's services concerning the remainder of the pack.

There is a proposition of law which also works in favor of the respondent's contention as to what the contract was. In the case of *Schurra v. Buffalo-Pitts Co.*, 44 Wash. 693, 87 Pac. 945, we said:

"While, as we have indicated, the general rule is that a contract of agency ceases at the time prescribed in the agreement, yet, it is equally established that, if an agent employed at an agreed price for a certain time continues in the same employment after the expiration of the term, without any new agreement, the presumption of law is that he continues at the original rate of compensation and that there can be no recovery upon a *quantum meruit.*"

The statement of facts is extensive and the correspondence voluminous. While the case is important, we cannot extend this opinion by going into greater details concerning the facts. We have given much time and care to all the questions involved and, on the whole record, we cannot say that the findings of the trial court were clearly against the preponderance of the evidence. The judgment is affirmed.

PARKER, C. J., MACKINTOSH, FULLERTON, and HOLCOMB, JJ., concur.